ALMOND A. WHITE v. SYDNEY L. WRIGHT and Others.[1]

May 17, 1901.

Nos. 12,517—(38).

#### Cession of Indian Land—Entry by Certain Persons.

By treaty of February 22, 1855 (10 Stat. 1165), certain lands then ceded to the United States by the Chippewa Indians were made subject to article 6 of the treaty, which provided for the entry by missionaries, and such other persons as were then residing in the ceded country by authority of law, of one hundred sixty acres each, of such of the ceded lands as were outside of certain established reservations. Subsequently, by treaty of March 11, 1863 (12 Stat. 1249), the Indians relinquished some of their reservations, and in consideration thereof other reservations were enlarged and extended. By this enlargement and extension the lands now in dispute were included within one of the reservations.

#### Same—Treaty and Act of Congress.

*Held*, first, that the lands in question were withdrawn from the operation of said article 6 by the treaty of 1863. *Held*, second, that the right of entry provided in said article was not restored to any of the persons therein mentioned by an act of congress approved January 14, 1889, entitled "An act for the relief and civilization of the Chippewa Indians in the state of Minnesota" (25 Stat. 642).

Action in the district court for Cass county to determine adverse claims to real estate. Defendants Sydney L. Wright and Cass Land Company answered, with others, denying plaintiff's title and alleging possession and title in themselves and their grantees. From separate orders, Holland, J., sustaining separate demurrers of defendants Wright and Cass Land Company to the reply, plaintiff appealed. Both orders affirmed.

*Orville Rinehart*, for appellant.

*Lum, Neff & Hartley* and *J. L. Washburn*, for respondents.

COLLINS, J.

By treaty of February 22, 1855 (10 Stat. 1165), certain Chippewa Indians ceded to the United States a large acreage of land designated by boundary lines within which certain reservations of terri-

[1] Reported in 86 N. W. 91.

tory were specifically made for permanent homes for the Indians, with provisions for future allotments. Article 6 of this treaty reads as follows:

"The missionaries and such other persons as are now by authority of law residing in the country ceded by the first article of this agreement, shall each have the privilege of entering one hundred and sixty acres of the said ceded lands at one dollar and twenty-five cents per acre, said entries not to be made so as to interfere in any manner with the laying off of the several reservations herein provided for."

The lands here in question, less than one hundred sixty acres, were a part of the ceded lands, and were not within the boundaries of either of the reservations. It is admitted that they were then subject to entry under the terms of article 6. March 11, 1863 (12 Stat. 1249), a supplementary treaty was completed, by which certain portions of the reservations set apart by the former treaty were released and relinquished to the United States, and the boundaries of other reservations, or parts thereof, enlarged and extended. Certain other benefits were conferred upon the Indians; the express consideration for the enlargement of some of the reservations, and for the benefits received by the Indians, being their relinquishment to the United States of reservation rights acquired under the 1855 treaty. Under this treaty, and by the extension of a boundary line, the land in question, which had never been applied for under article 6, became a part of a reservation; and it seems to be conceded that it was no longer subject to entry, either under article 6, or by virtue of any of the public land laws of the United States. It was withdrawn from entry, and it admittedly remained within the reservation limits, actually as well as in theory, until January 14, 1889, when congress passed an act entitled "An act for the relief and civilization of the Chippewa Indians in the state of Minnesota" (25 Stat. 642). This act, among other things, provided for the cession and relinquishment by the Indians of their title to the reservations, with certain exceptions, to the United States, upon the terms stated therein. The land in question was a part of the land so ceded and relinquished. The act provided for the survey of the ceded lands, for their

examination by 40's for the purpose of determining what lands were pine lands, and for estimating the timber thereon; all other lands being termed, under the act, "agricultural lands." Provision was made for the advertisement and public sale of the pine lands, and for the survey and disposition, under the homestead laws, of the agricultural lands. The money accruing from the disposition of these lands was to constitute a special fund for the benefit of the Indians, to be used to carry out the purpose of the law as avowed and embraced in its title. The tracts in question came within the classification of pine land; were duly examined, and the pine thereon estimated, long before plaintiff's grantor, Glass, attempted to assert a right thereto.

July 10, 1899, Glass, claiming to be one of the class of persons included within the sixth article of the treaty of 1855, applied to the officers of the local land office to enter these particular tracts of land. He was then and there qualified to make an entry, and, in form, his application was adequate. It was refused upon positive instructions from the general land office and the secretary of the interior to the effect that such land was not subject to entry under the treaty before mentioned. Glass then conveyed to plaintiff.

On November 1, 1899, one Wright purchased these tracts at public auction under the provisions of the act of January 14, 1889, and supplementary acts, paid the government price, received final receipts, and the defendant company has succeeded to his title. No patents had been issued by the government at the time of the commencement of this action, or trial of the issue of law raised by the demurrer.

This action was brought to determine adverse claims, the plaintiff alleging possession and title in fee. The defendants answered the complaint, denying that the plaintiff was ever in possession of any part of the premises; alleged possession in defendants since November 1, 1899, the purchase of the lands from the United States by Wright, and the sale and conveyance thereof by him to the company. The demand in the answer was that the action be dismissed, and that defendants recover their costs and disbursements. The plaintiff replied, and therein set forth at great length

the matters outlined above, under which he claimed he became entitled to the land, alleged defendant's final receipt to be a cloud upon his title, and demanded that the legal title evidenced by such receipt be charged with a trust in his favor. The defendants Wright and Cass Land Company separately demurred to the reply, and these demurrers were sustained by formal orders. From each an appeal has been taken, both being considered together.

The defendants raise some technical questions as to the sufficiency of the pleadings, and also make a point that, until patents issue to these lands to Wright, the purchaser at the sale, the plaintiff cannot maintain an action to determine adverse claims. We put aside these technical questions; assume that the pleadings are sufficient, and that, under a former decision of this court (McHenry v. Nygaard, 72 Minn. 2, 74 N. W. 1106), an action may now be maintained to determine defendants' adverse claim, because nothing remains to be done but the mere ministerial act of issuing the patents. With this assumption we proceed to consider the allegations of the pleadings, treating them as true, of course.

The provisions of section 6 of the treaty under which the plaintiff claims did not constitute a grant in præsenti, nor did they purport to do so. A privilege was given to certain persons therein specified in a general way, to be exercised by them, at their option, upon lands not embraced within the reservations. It was limited to the lands within the boundaries of the ceded tracts not reserved, and was simply an offer, to be accepted or not, as to these particular tracts of land, and the proposition remained open until the treaty of 1863. These tracts, or any other tracts within the limits and outside of the reservations, were subject to be located by Glass, or by any other of the qualified persons, at any time prior to their withdrawal by the subsequent treaty. He did not locate or apply to enter, and does not claim through any act performed by him while the land was open to appropriation, as before stated. The United States then entered into a treaty with the Indians by the terms of which the latter released, relinquished, and ceded to the former all their rights on and to certain reservations, which had been marked out upon the land by the treaty of 1855; and in consideration thereof the public authorities read-

83 M.—15

justed the limits of other reservations, and entered into a compact whereby the new reservations were substituted for the old. It was, as between the parties, an exchange of lands; the Indians surrendering and relinquishing their rights to the occupancy of certain lands reserved for their homes; and the government agreeing, upon its part, and in consideration thereof, that other tracts —among them, those now in dispute—should be substituted therefor. The government exercised a right it had, and these tracts immediately became a part of a reservation, and have so remained, unless they have been affected by the act of January 14, 1889, generally known as the "Nelson Law."

It is argued on the part of the plaintiff that, on the acceptance by the Indians of the provisions of the Nelson act, the land which had been opened or subject to entry under article 6 of the 1855 treaty became relieved of its character as part of a reservation, and at once assumed its original status, and thus open to entry by any person duly qualified as a missionary, or as a resident on the ceded lands by authority of law, when the treaty was made. If this contention be sound, it follows that every acre of land which was originally outside of a reservation, but was subsequently brought within, became subject to entry, under the general land laws of the United States, immediately upon the passage of the Nelson law. That enactment operated, according to the theory of plaintiff's counsel, not only to break faith with the Indians, but to devest the government of all power to dispose of the lands taken into the reservations in 1863 for the first time, and to throw the whole thereof open to sale and settlement under the general laws.

By the treaty of 1863 it is very evident that the land in question was taken from the public domain, and, by agreement with the Indians, who surrendered valuable rights in consideration thereof, appropriated for reservation purposes. If this treaty was valid, and the authorities had the power to make it, as counsel seems to admit,—that is, the power to appropriate any part of the ceded lands to reservation purposes,—it inevitably follows that there could be no restriction upon this power. It was plenary and absolute, and it was not limited to the right simply to set aside and reserve the lands for a specific purpose or object; that right to

end when the purpose or object no longer existed. Counsel for plaintiff does not question the power of the government to enter into the compact of 1863, and, if he does not, it is difficult to see under what provisions of the Nelson act the reserved lands were restored to the public domain, or made subject to entry by Glass. The compact with the Indians under which their reservation boundary lines were readjusted in 1863 was maintained and carried out by the Nelson law. That law was to become effective if accepted by the majority of the Indians whose reservation rights were being encroached upon or dealt with, and if approved by the president. Its terms were accepted by the Indians, and thereupon the president approved the cession, and the Indians' title became extinguished. But special provision was made in the law itself for the disposition of the land at public auction under certain restrictions; the proceeds of the sale to be devoted to the use of the Indians. This specified disposition of the lands and of the proceeds amounted to an agreement between the government and its wards, and an inhibition upon the sale or disposition of the lands in any other manner. It operated to forbid a disposal of the lands therein mentioned, except in the precise way pointed out by the act. The object to be attained would be wholly defeated if any part thereof could be appropriated or disposed of by an entry under article 6 or otherwise. It was as effective, so far as any claim can be made under the treaty of 1855, as if there had been an express provision prohibiting the entry under the provisions of article 6.

This construction of the Nelson law is unavoidable, if we are to pay the least attention to its avowed purpose, or to the necessity of keeping faith with the Indians. The lands in question were especially set apart and appropriated as a reservation for the Indians, with all that may be implied from such appropriation. Later, congress enacted that, with the approval of the Indians, these reservation lands might be sold, and the proceeds thereof set aside for the benefit of the Indians, and to their use. They cannot directly or indirectly be deprived of the money which is or has been derived from a sale of all of the lands on all of the specified reservations. All of the purposes of that act must be

carried out in good faith by a sale of the lands exactly as stipulated, and to allow the plaintiff to enter the land in question would violate its terms in a wholly indefensible manner. Under no circumstances or conditions should this be, countenanced or aided by the courts. There is not a word in the Nelson law which indicates an intent to permit these lands to become open to an entry under the 1855 treaty, and in fact there is the positive and unequivocal declaration as to the manner of disposal, as before stated. In Shepley v. Cowan, 91 U. S. 330, the court said:

"Whenever in the disposition of the public lands any action is required to be taken by an officer of the land department, all proceedings tending to defeat such action are impliedly inhibited. The allowance of selections by the states or of pre-emptions by individuals of lands which might be included within grants to others might interfere, and in many instances would interfere, with the accomplishment of the purposes of the government. A sale is as much prohibited by a law of congress, when to allow it would defeat the object of that law, as though the inhibition were in direct terms declared."

By the Nelson act, congress provided a method for the disposition of this land, and that method is exclusive. For the officers of the interior department to make or allow any other disposal of the lands than that provided would have been a total violation of the law.

Both orders affirmed.